IN THE UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH MARTIN,<br>　*Plaintiff,* | §<br>§<br>§ | |
| V. | §<br>§ | CIVIL ACTION NO. _____ |
| CITY OF HOUSTON, TEXAS and<br>INDIVIDUALLY, AARON PETTY, and<br>JOHN SANDERS.<br>　*Defendants.* | §<br>§<br>§<br>§<br>§ | JURY TRIAL DEMANDED |

**PLANITIFF KEITH MARTIN'S ORIGINAL COMPLAINT**

Plaintiff KEITH MARTIN files this Original Complaint against Defendants AARON PETTY, JOHN SANDERS and CITY OF HOUSTON, TEXAS ("City") (hereinafter collectively referred to as "Defendants"), and in support, respectfully shows the following:

**I.
PRELIMINARY STATEMENT**

1.　Keith Martin suffered serious physical and psychological injury, after approaching a vehicle to offer his detailing services, was shot four times by an undercover police officer, Aaron Petty ("Petty") who, at the time of the shooting, was not known to Martin to be a police officer. Defendant Petty did not identify himself a policy officer or make any verbal statements to Keith Martin. At no time prior to the shooting could Martin's interaction with Petty or Sanders be considered a police encounter.

2.　Further, as Keith Martin engaged in similar conduct–offering his detailing services to private citizens–numerous times over a number of years, and the only time he was shot, was when he approached an HPD officer, it is clear that the moving force behind his injuries were the policies, practices and customs of the City of Houston.

## II.
## PARTIES

3. Plaintiff KEITH MARTIN is a resident of Texas. Plaintiff resides in Houston, Harris County, Texas. Plaintiff was a permanent resident of the State of Texas when the events or omissions giving rise to this lawsuit occurred. Plaintiff was the victim of this police shooting. The events giving rise to this lawsuit culminated with the shooting and consequent severe and permanent injuries of KEITH MARTIN. Accordingly, Martin brings this suit in his individual capacity as the victim of this unconstitutional police action.

4. Defendant AARON PETTY is sued in his individual capacity, at all times material to the claims set forth herein, acted under color of law, and was employed as a police officer by Defendant City of Houston.

5. Defendant JOHN SANDERS is sued in his individual capacity, at all times material to the claims set forth herein, acted under color of law, and was employed as a police officer by Defendant City of Houston.

6. Defendant CITY OF HOUSTON, TEXAS, is a Governmental Entity and political subdivision of the State of Texas. At all times material to the claims set forth herein, Mayor Sylvester Turner (hereinafter "Mayor Turner") was the top elected official of the City of Houston and its top policymaker for the City of Houston, along with members of the City Council. Mayor Turner approved the policies regarding investigation citizen complaints of police misconduct.

## III.
## JURISDICTION & VENUE

7. This Honorable Court has federal- question jurisdiction pursuant to 28 U.S.C. § 1331 because the matter arises under the Constitution, laws, or treaties of the United States; specifically, this claim seeks rights and remedies provided by the United States Constitution and 42 U.S.C. §§

1983, 1988. See also 28 U.S.C. § 1331(a)(3).

8.     Supplemental jurisdiction over the pendant state-law claims is proper under 28 U.S.C. § 1367(a) because the state-law claims form a part of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a)(1) and 1391(c) because all defendants reside in Texas and one or more defendants reside in this judicial district and, more specifically, this division of this judicial district. Further, as provided under 28 U.S.C. 1391(b)(2), a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## IV.
## FACTUAL BACKGROUND

10.    On the afternoon of January 9, 2020, Keith Martin, Sr., approached an unmarked, black Chevrolet Silverado (the "Vehicle") in the area of 8100 Martin Luther King, Jr., Blvd., in a Walgreens parking, to offer his vehicle detailing services.

11.    Keith Martin lived near this this area and regularly offered his mobile detailing services to drivers around this intersection without incident. It was only when he unknowingly approached an HPD officer–acting in furtherance  that he was shot for doing so.

12.    Unbeknownst to Keith Martin, the vehicle was occupied by two undercover HPD officers, John Sanders, who was in driver's seat, and Aaron Petty, who was in the passenger seat.

13.    Petty and Sanders were allegedly conducting surveillance in an undercover narcotics investigation.

14.    Defendant Sanders was the first to observe Martin in the parking lot.

15.    Defendant Sanders told Defendant Petty to "watch" Martin.

16.    Keith Martin was not aggressive or belligerent.

17. Keith Martin did not display a weapon.

18. Keith Martin did not tell Defendants Petty or Sanders that he had a weapon.

19. Keith Martin did not tell Defendants, Petty or Sanders that he was going to harm them.

20. Keith Martin had no motive to harm Defendants Petty or Sanders.

21. Keith Martin had a backpack that contained automobile detailing supplies, but he did not have a weapon. Particularly, Martin did not have a gun, or any other weapon that could cause Petty and Sanders harm, or place them in reasonable fear of imminent serious bodily injury or death.

22. Keith Martin intentionally stood in the front of the vehicle so that Petty and Sanders could see him as he attempted to communicate his offer to wash their car through nonverbal communication.

23. Initially, Martin tried to communicate verbally, but as the windows were rolled up, he did not think the occupants could hear him because they did not respond to initial verbal offer of his detailing services.

24. Defendants Petty and Sanders observed Martin attempting to get their attention.

25. Neither Defendant Petty or Sanders rolled down their window or opened their door.

26. Neither Defendant Petty or Sanders identified themselves as police officers.

27. Neither Defendant Petty or Sanders asked Martin to leave or communicated that they were not interested in his services–an act that could have prevented what happened next.

28. Instead, without warning or justification, from a seated position, Defendant Petty fired four bullets into Keith Martin through the windshield of the Vehicle.

29. Defendant Petty shot Keith Martin in his head, chest, arm and stomach.

30. Defendant Petty did not give any verbal commands to Keith Martin prior to firing four bullets into him.

31. After Patty shot Martin, Defendants Petty and Sanders handcuffed him.

32. Prior to the shooting, Defendants Petty and Sanders suspected that Keith Martin was mentally ill, intoxicated or that something was wrong with him.

33. At no time during this encounter did Defendants Petty or Sanders observe a weapon.

34. At no time during this encounter did Defendants Petty or Sanders allege that Martin attempted to remove an item from his backpack.

35. Defendant Sanders witnessed Keith Martin's actions but did not draw, or fire, his weapon.

36. Surveillance video from a nearby business captured the moment immediately after Defendant Petty shot Keith Martin.

37. The surveillance video showed that Keith Martin was standing in front of the vehicle just before he fell to ground.

38. Upon information and belief, Defendants Petty and Sanders were not investigating or surveilling a suspect that was known to murder police officers.

### After Shooting Keith Martin, Defendant Officers Unlawfully Arrested him for Terroristic Threat

39. Fortunately, Keith Martin's multiple gunshot wounds were not fatal. Martin was transported to the hospital where he received surgery for his injuries. Unfortunately, two of the bullets were not able to be safely removed, and now permanently reside in Mr. Martin's body.

40. Defendant Petty alleged Keith Martin, while at the driver side door, gestured to get Petty and Sander's attention and stated "I got something for you."

41. Defendant Petty alleged that Keith Martin then moved to another the passenger side of the vehicle and repeated that "I got something for you."

42. Interestingly, Defendant Petty alleged he perceived this statement to be a threat.

43. Defendants Petty and Sanders did not allege that Keith Martin made any sudden

movements.

44. After shooting Keith Martin, Defendant Petty alleged that he feared that Keith Martin was about to shoot him.

45. However, despite not observing or finding a gun, Defendants Petty and Sanders still arrested and charged Keith Martin for Terroristic Threat.

46. Defendants Officers did not hear Martin say that he had a gun.

47. Defendant Officer did not hear Martin say that he was going to shoot them.

48. Defendant Petty stated that he heard Keith Martin say, "I got something for you."

49. Defendant Petty did observe an object in Keith Martin's hand prior to shooting him.

50. No reasonable person would have interpreted Martin's alleged statement(s) or conduct to communicate a threat, and certainly not an imminent threat of serious bodily injury.

51. There was no statement(s) made by Keith Martin that articulated a desire to inflict harm, or the means in which harm may be inflicted.

52. Defendant Petty alleged that he believed he was about to be the victim of a police assassination.

53. Tellingly, Defendant Sanders did not believe he was about to be victim of a police assassination.

54. Defendant Petty was able to draw his weapon and fire four shots into Keith Martin. Defendant Sanders did not fire a single shot or intervene to prevent or stop Defendant Petty's grossly unreasonable response of use of unwarranted deadly force.

55. At best, Martin's alleged statements were ambiguous, and Defendant Petty's egregious interpretation that Martin intended to harm him was rooted in racial prejudice, bias and/or animus, and his comfort and willingness to shoot Keith Martin under these circumstances stemmed from

the City's training and practice of ensuring that its officers are exonerated and face no consequences for using excessive (including deadly) force.

56. The charging indictment against Keith Martin alleged that Martin "***threatened to commit an offense, namely Aaron Petty upon Aaron Petty***."

57. Defendants Petty and Sanders completely failed to articulate what offense Martin threatened to commit, and knowingly arrested him without probable cause in order to remediate Petty's obvious use of excessive force.

58. The indictment failed to provide Martin with adequate notice of the offense for which he was charged, thus constitutionally deficient. Nevertheless, the charge was only dismissed the day before Martin was scheduled to stand trial for the nonexistent threat.

**City of Houston's Policy and Practices Were the Moving Force Behind the Constitutional Violations Inflicted Against Keith Martin**

59. Defendant City has a well-established policy and practice of failing to adequately investigate excessive force allegations and investigating citizen complaints with a pro-officer bias. The City's intentional failure to adequately investigate its police officers following shootings created a de facto deadly force policy that allowed individual HPD officers to use deadly force at their discretion.

60. Defendant City instills unreasonable fear in its officers, while at the same time, the Houston Police Department teaches its officers that "coming home at the end of the night" is paramount. Consequently, HPD officers make value judgments that place their safety as a higher priority than that of the citizens they are duty-bound to protect.

61. Put another way, Defendant City has an unofficial excessive force policy gave its officers an unqualified license to use deadly force without repercussion. Pursuant to that unofficial policy, HPD Officer Aaron Petty shot Keith Martin, without ever observing a weapon, four times from

7

the passenger seat of a parked vehicle.

62. In fact, Keith Martin regularly offered his mobile detailing services to drivers around this intersection without incident. It was only when he approached an HPD officer that he was shot for doing so.

63. This incident was simply the latest in a long line of shooting cases where an HPD officer unjustifiably shot a person and the City's investigation was deliberately tailored toward justifying the excessive use of force.

64. Between March 2005 and March 2010, the City of Houston failed to find a single shooting of another person by an HPD officer to be unjustified.

65. Likewise, the City's manufactured "perfect" record of zero unjustified shootings of other humans continued through October 2012 – when an HPD Officer shot and killed Kenny Releford.

66. The City's self-examined "perfect" record continued still through August 2015, with the tasering and shooting of Alan Pean, a naked and unarmed man, in his own hospital room.

67. The City of Houston found HPD officer Oscar Ortega's shooting of Alan Pean to be justified.

68. The Coronado shooting of the Ventura brothers. In this instance, officer Coronado, who had been drinking at a bar and was legally intoxicated, when he shot two unarmed citizens (killing one) after intervening in a situation outside of a bar. Coronado alleged the victims gestured as a justification for his use of deadly force. The City found the shooting justified despite the fact that the officer was intoxicated and committed other policy violations in the incident, crediting his account over other witnesses.

69. The Shooting of Gene Horace. In another case involving the claim that the victim was reaching for a waistband, an officer shot an unarmed man in the back while he was running away.

HPD found it justified based solely because the officer's claim that the man reached for his waistband and despite the fact that Mr. Horace denied it. Like the Coronado Shooting, the City found the shooting justified even though it sustained two other charges against the officer.

70. The Shooting of Rufino Lara. The City also justified the shooting by another officer of an unarmed man, Mr. Lara, for allegedly reaching for his waistband while he was walking away. Two witnesses at the scene in that case rebutted the officer's contention that Mr. Lara was reaching into his waistband—one saying that his hands were on the wall. Although reviewers had concerns about the instance, and suggested training HPD did absolutely nothing to provide any response.

71. September 24, 2012, HPD Shooting at an Unknown Suspect. Another unarmed man was shot at while running from the police after stealing food from a food truck because the man allegedly reached for his waistband. He had committed no violent act and no weapon was actually seen or recovered. The City found the incident justified.

72. Upon information and belief, in 2020, an off-duty HPD sergeant fired his weapon at an Uber driver–*while intoxicated*–and was not charged or terminated after an IAD investigation.

73. The City of Houston found HPD officer Matthew Marin's shooting of Brian Claunch, a double amputee, in September 2012 to be justified. Although evidence demonstrated that Officer Marin's statement was inconsistent with the crime scene evidence.

74. For example, in February of 2010, an HPD officer shot Steven Guidry in the neck in southwest Houston after claiming Guidry "reached into his waistband as if to get a weapon." Likewise, in October of 2012, an HPD officer shot Ricardo Salazar-Limon in the back by claiming that, as he walked away from the officer, Salazar-Limon "reached for his waistband."

75. In fact, on information and belief, in the over 600 police-involved shootings between 2008 and 2012 in Houston, the Department did not ever determine that an intentional discharge was

9

unjustified. Indeed, neither officer involved in the Guidry or Salazar-Limon shootings described above were disciplined for their shooting of unarmed individuals.

76. Continuing from August 2015 through Petty's July 2018 shooting of Keith Martin, the City continued to find every intentional, i.e. non-accidental, shooting perpetrated by its HPD officers to be justified.

77. Pursuant to Defendant City's inadequate training, unchecked custom of unlawfully arresting citizens after using excessive force, and policy of covering up its officers' misconduct, Keith Martin was arrested and charged for terroristic threat.

78. Not only does Defendant City fail to adequately investigate its officers use of deadly force, it teaches its officers about qualified immunity, stressing the importance of articulating facts that justify their enforcement actions. When teaching HPD officers when they are authorized to use deadly force, Defendant City knowingly, and simultaneously, teaches its officers how to justify uses of excessive force. Which effectively amounts to a de facto policy of training its officers how to avoid liability after using excessive force, which compounds and further establishes City's illicit practice of inadequately investigating use of force incidents.

79. Whether it is "reaching for the waistband," "turning away from the officer," or "erratic behavior," Houston Police officers are always deemed justified; and their fears about weapons—even when proven wrong—are always credited by the City. Whenever a Houston Police officer alleges a suspicion about a weapon, it is always deemed reasonable. Effectively, this creates a policy that officers are justified in using deadly force when a suspect's hands are not visible. Such a policy is dangerous, unreasonable and unlawful.

80. Consequently, HPD officers have demonstrated, an otherwise inexplicable and statistically abnormal, pattern of alleging that they believed a suspect was "reaching for a weapon" after they

shoot unarmed (predominantly African American) suspects.

81. Tellingly, HPD officers never used the excuse of "reaching for waistband/into a pocket" as a reason to shoot a white person.

### City Has a Custom or Practice of Automatically Crediting its Officers

82. What's more, Defendant City has a policy of crediting its officer's version of the facts over witnesses and suspects (victims of use of force by HPD officers), even when reason and logic are offended by the officer's version—like in this case. Thus, City's liability for Keith Martin's injuries extend past its systemic policies on race-based policing and defunct internal investigations, but also its active, affective biases of its policymakers giving rise to unchecked (or inadequately checked) misconduct.

83. Here, Defendant Petty alleges that he believed Keith Martin was reaching for a weapon.

84. Defendant Petty alleges that Keith Martin pointed a backpack at him (which may be a first as far as justifications for shooting someone goes). Nonetheless, Chief Acevedo unflinchingly adopted Petty's version of the facts.

85. Stated differently, Defendant City's policy or practice of so willing to credit any hunch or minor concern as a "significant threat of death or serious physical injury" that they have effectively lowered the standard so far that all an officer needs to do—at a level lower than even a Terry stop—is articulate some suspicion about feeling "threatened" and they will be justified. The Houston Police Department, of course, has ready examples it will accept, many of which (like "reaching for the waistband") are often impossible to verify and extremely difficult to contest.

86. However, ever under Defendant Petty's version, it would Officer Petty did not shoot even it was proven that Martin "levelled his backpack" in the described manner, there is no historical bases that would support a reasonable belief that Martin posed an imminent threat to the Individual

Defendants.

87. The Department's failure to adequately train and discipline officers regarding the proper use of deadly force causes, and/or encourages the use of unconstitutional deadly force by Houston Police officers.

88. The Department's record concerning its failure to train and discipline officers regarding the use of deadly force illustrates the City's deliberate indifference to the rights of individuals, particularly including the rights of citizens who, like Keith Martin, were completely unarmed when they were shot.

89. The City's failures to train and discipline their officers with respect to their uses of excessive force also extend to HPD officers' unconstitutional use of an individual's race, both when deciding to detain an individual and when electing to use force. Like Keith Martin, a number of unarmed individuals shot by HPD officers are people of color—Mr. Guidry, Mr. Salazar-Limon, and Mr. Pean stand out as such examples.

### HPD's Narcotics Division Has Widespread Inadequate Training, Supervision and Corruption

90. In February 2019, Chief Art Acevedo ordered an investigative audit of the Houston Police Department's Narcotics Division, which stemmed from an unlawful shooting by undercover police officers. One of the objectives of the audit was to decrease the risk associated with high-risk narcotics operations for both the officer and citizen.

91. Clearly, the inefficiencies, inadequacies, corruption, and safety measures the audit attempted to remediate of the HPD Narcotics Division persists, which were the moving force behind Petty unlawfully shooting Keith Martin, and covering it up and compounding it with an unlawful arrest.

### HPD Officers Routinely Engage in Race-based Policing

92. Upon information and belief, the City's police officers frequently use race in their policing, both in determining when and whom to detain but also in their decisions to use force.

93. Houston officers use race when determining to detain and use force against people of color in a manner disproportionate to their proportionate representation in the population, illustrative of the Department's unconstitutional race-based practices.

94. One half of all HPD shootings from 2009 to 2014 are of black citizens—twice their share of the population.

95. Data collected by City of Houston, shows that black citizens are approximately 2.5 times more likely to be shot by HPD officers. Even more so, when unarmed.

96. In fact, in 2020, each of the unarmed individuals who were shot, including Keith Martin, were black men.

### City Has a Custom, Policy and/or Practice of Automatically Crediting its Officers' Version of Facts

97. The City has encouraged unjustified uses of deadly force by crediting, supporting, and facilitating erroneous policing; and by failing to adequately investigate allegations of police misconduct or intentionally investigating complaints to reach a desired outcome.

98. In fact, Chief Acevedo has participated in an IAD investigation in which an investigator was ordered by her superior not to interview an admittedly material witness (who was identified as an exculpatory witness), and received no discipline.

99. These shooting injuries and deaths, along with all others perpetrated by HPD between 2005 and 2018, were uniformly whitewashed by HPD's internal affairs and homicide divisions.

100. Between March 2005 and July 2018 (a period of more than 13 years) no HPD shooting of another human was determined by the City to be unjustified.

101. The City is aware that its officers allege that a suspect gestured as justification for shooting

an unarmed suspect. Nonetheless, there is no statistical deviation from the investigative outcomes from officer involved shootings where the suspect is armed.

102. The Houston Police Department has also failed to meet firearm training requirements recommended by national police agencies. In addition, at the time of the shooting, the Department failed to have meaningful internal controls or policies that would prevent unlawful police shootings like the one that led to Keith Martin being met with a barrage of bullets.

103. The City has remarkably, and routinely adopts (and concur with) its officers allegations that they felt threatened by a suspect's actions and/or words; or routinely adopt (and concur with) its officers subjective interpretation of threats made by suspects.

104. In fact, only a few hours following the shooting and subsequent arrest of Keith Martin, Chief Art Acevedo held a press conference regarding the incident.

105. Chief Acevedo stated that Keith Martin, "based on his movements, his actions, his statements, he was certainly trying to pretend and trying to make the Officers believe that he had a gun and was about to shoot."

106. Keith Martin never stated that he was trying to pretend like he had a gun or that he was about to shoot.

107. Chief Acevedo further stated, conclusively, that "the officer that did discharge fired thinking he was about to get shot."[1]

108. Chief Acevedo indicated that Keith Martin was homeless.

109. At the time Chief Acevedo held this press conference, he had not spoken to Keith Martin.

110. Chief Acevedo's comments compounded, and underscored, his officers' actions and omissions.

---

[1] https://www.pscp.tv/w/1YqKDnoNVPeJV

111. Most troubling is Chief Acevedo's automatic determination of credibility of the officers' actions–even when faced with facts that call into question the credibility of the Defendant Officers' statements.

112. Chief Acevedo stated that there was no gun in Martin's backpack, but instead of this fact causing him to question the Defendant Officers' version of what happened, Acevedo immediately begins to question Keith Martin's mental state.

113. Exemplifying and establishing the City's policy of adopting its officers' version of the events without adequate investigation, and without even speaking with the suspect.

114. In April 2020, after a veteran HPD officer with 10 years on the SWAT team shot Kevin Johnson, an unarmed African American male, who was allegedly hiding in an attic, Chief Acevedo stated "you can imagine he's beating himself up much more than we'll ever beat him up."[2] A sentiment that Acevedo could not possibly know, but yet another display of sympathy to the shooter, and indifference to the victim, in response to an officer who shot an unarmed black man.

115. Defendant City has implemented a very coddling process for obtaining officers statements following an Officer Involved Shooting, but has no such process when questioning victims of Officer Involved Shootings.

116. In fact, Defendant City questioned Keith Martin regarding the shooting while he was medicated in the hospital.

117. Upon information and belief, Houston Police officers took a DNA sample from Keith Martin without a warrant while he was incarcerated. Keith Martin was told by the warden that before he could be released from jail, he would have to submit to a DNA swab.

118. Defendant City publishes a list of the Officer Involved Shootings on its website. While the

---

[2] https://www.chron.com/news/houston-texas/houston/article/Officer-shoots-suspect-in-southwest-Houston-15177350.php

15

City lists the Keith Martin shooting incident, it intentionally and tellingly, describes another incident in the summary. Presumably, because the details of this incident are so ignominious, the City does not want them published.

119. This result of City's unlawful policies, practices and customs effectively give HPD officers a license to shoot with impunity, which was the moving force behind Keith Martin's injury.

## V.
## KEITH MARTIN'S DAMAGES

120. The Defendants' actions imposed substantial and permanent harm on Keith Martin. Keith Martin suffered severe physical pain as a result of his gunshot wounds. Keith Martin now has two bullets in his body that could not be safely removed through surgery. Keith Martin has also sustained severe psychological trauma. Martin and his family, including his three children, have suffered a great deal of harm given Keith Martin's mental decline.

## VI.
## CAUSES OF ACTIONS

### *FIRST CLAIM FOR RELIEF – 42 U.S.C. § 1983 VIOLATIONS*

121. Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

122. *Section 1983.* The Civil Rights Act of 1871 (Ku Klux Klan Act), now codified as 42 U.S.C. § 1983 as federal law provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

123.    **§ 1983 - *Excessive Force***. As described in the preceding paragraphs, Keith Martin pleads that Defendant Petty used excessive force in the against him in violation of the Fourth Amendment when Petty shot him without need or justification. Mr. Martin further pleads that Defendant Sanders knew that Petty was about to use excessive deadly force against Martin, had the opportunity to stop Petty, but intentionally failed to intervene. Further, as Sanders was, at all relevant times, present and observed Martin's conduct, yet did not thereby commence to shooting Martin, like Petty. Thus, it is clear from the facts of this case that Petty's alleged belief that Martin was about to shoot was, in addition to being wrong, also unreasonable; and that not every reasonable officer would have acted in the manner as Petty, being presented with the same circumstances.

124.    **§ 1983 – *Unlawful Arrest***. As described in the preceding paragraphs, Keith Martin pleads that Defendants Petty and Sanders intentionally arrested him without probable cause, in violation of his Fourth Amendment right to remain free from unreasonable seizure. Mr. Martin further pleads that Defendant Sanders and Petty intentionally made false statements to justify their arrest of Keith Martin, demonstrating malice and an intent to inflict harm Martin. Specifically, Defendants' Petty and Sanders only arrested Martin to justify Petty's egregious and unlawful use of force. Even under their falsified narrative of Martin's actions, Defendants Sanders and Petty failed to articulate how, when or what crime Keith Martin threatened to commit.

125.    **§ 1983 – *Equal Protection***. As described in the preceding paragraphs, Defendants Petty and Sanders violated Plaintiff's constitutional rights intentionally subjecting him to unlawful unequal treatment on the basis of his race in violation of the Fourteenth Amendment of United States Constitution. Defendants Petty and Sanders' conduct created discriminatory effect by unreasonably viewing Keith Martin as a threat, shooting him and arresting him based on his race.

126. **<u>§ 1983 – Municipal Liability.</u>** As described in the preceding paragraphs, Keith Martin pleads that Defendants Petty and Sanders' violation of his rights were proximately caused by the unlawful policies, practices and customs of the City of Houston. Specifically, as a matter of both policy and practice, the City of Houston encourages, and is thereby the moving force behind, the very type of misconduct described above by failing to adequately train, supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference.

127. As a matter of both policy and practice, the City of Houston facilitates the very type of misconduct at as described above by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. Accordingly, in that way, the City of Houston directly encouraging future uses of excessive deadly force, unlawful detention, failures to intervene, and race-based policing such as those Plaintiff complains of. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Houston Police Department violate the constitutional rights of individuals in a manner similar to that alleged herein by Keith Martin on a regular basis, yet the Houston Police Department investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases.

128. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of the Defendants Petty and Sanders, Plaintiff has suffered severe and permanent injuries, including severe emotional distress.

## VII.
## ATTORNEY FEES

129. Upon prevailing in this matter, Plaintiff is entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988 or any other applicable law necessity of authenticating the document(s). Plaintiff hereby requests that the Court and jury award his attorney's fees and expenses.

## VIII.
## JURY DEMAND

130. Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## IX.
## PRAYER

131. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants AARON PETTY, JOHN SANDERS, and CITY OF HOUSTON, award compensatory damages and attorneys' fees; award punitive damages against Defendants AARON PETTY and JOHN SANDERS; pre- and post-judgment interest, costs of court, and provide any other relief this Court deems just and appropriate.

Respectfully submitted,

ANDRE EVANS & ASSOCIATES, PLLC

*/s/ Andre D. Evans*
ANDRE D. EVANS
Federal Bar I.D. No. 2553080
3003 South Loop West, Suite 108
Houston, Texas 77054
Tel: (832) 941-1282
Fax: (832) 778-8353
andre@attorneyandreevans.com

**ATTORNEY FOR PLAINTIFF**